STATE OF MAINE
ANDROSCOGGIN, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. C v - 21 - 2

MELISSA J. NASON,                        )
an adult individual resident of Auburn,  )
County of Androscoggin, State of         )
Maine,                                   )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )
                                         )
PRIME GROUP HOLDINGS, LLC,               )
a New York limited liability company     )
doing business in Maine,                 )
                                         )
          Defendant.                     )

## COMPLAINT AND REQUEST FOR JURY TRIAL
## AND INJUNCTIVE RELIEF

Melissa J. Nason (hereinafter referred to as "Plaintiff" or "Ms. Nason") makes the

following complaint against Prime Group Holdings, LLC (hereinafter referred to as "Defendant"

or "PGH").

### Parties

1.    Ms. Nason is a female citizen of the State of Maine, living in the City of Auburn

in the County of Androscoggin.

2.    PGH is a New York limited liability corporation operating in Maine.

3.    During all relevant events, PGH operated its business in Auburn, Maine.

4.    Venue lies in Androscoggin County pursuant to 14 M.R.S. §§ 501 and 505.

### Procedural Background

5.    This is an action for declaratory and injunctive relief and monetary damages to

redress the deprivation of rights secured to the Plaintiff by Title VII of the Civil Rights Act ("Title

VII"), 42 U.S.C. § 2000e-2, the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4572, the

Americans with Disabilities Act as Amended ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the

Whistleblowers' Protection Act ("WPA"), 26 M.R.S. § 831 *et seq.*  Plaintiff also brings a claim

for declaratory and injunctive relief for retaliation under Title VII, 42 U.S.C. § 2000e-3(a), and

the MHRA, 5 M.R.S. § 4633.

6.   On or about March 11, 2019, Plaintiff filed a timely charge of discrimination with

the Maine Human Rights Commission ("MHRC").

7.   On or about March 11, 2019, Plaintiff filed with the Equal Employment

Opportunity Commission ("EEOC") a charge of discrimination.

8.   Plaintiff exhausted all of her administrative remedies.

9.   Plaintiff timely filed this complaint in court.

10.   Plaintiff has satisfied the requirements of 5 M.R.S. § 4622.

11.   Prior to filing this action, the MHRC issued a right to sue letter pursuant to 5

M.R.S. § 4621, on October 21, 2020.

12.   Prior to the filing of this action, the EEOC issued a Dismissal and Notice of Rights

on December 23, 2020.

### Jury Demand

13.   Plaintiff demands trial by jury of all claims to the extent allowed by law.

### Factual Background

14.   Ms. Nason is more than 70% deaf.  Ms. Nason's hearing loss substantially limits

her ability to understand and participate in telephone calls and sometimes limits her ability to

communicate in person, depending on the circumstances.  Ms. Nason also suffers from an anxiety

disorder.

15.     PGH was aware of Ms. Nason's hearing disability at all times during her employment and was aware that Ms. Nason suffered from anxiety during the course of the events relevant to this Complaint.

16.     PGH is a management company for more than 200 storage facilities located in 24 different states, including Maine.

17.     Ms. Nason began working at PGH on or about March 9, 2016, as a General Manager ("GM") in the Auburn, Maine location of PGH.

18.     During her tenure as GM, Ms. Nason received no negative write-ups or coaching of any kind.  To the contrary, she performed her job exceptionally well, as evidenced by her multiple promotions within a short period of time:

      a.  Five months after she was hired, on July 27, 2016, Ms. Nason was promoted to Team Lead, which made her responsible for not only the Auburn PGH facility but four others as well.

      b.  Less than three months later, on October 10, 2016, Ms. Nason was promoted again, this time to Area Manager, which made her responsible for even more PGH locations spread across Maine, New Hampshire and Massachusetts, approximately twelve in total.

      c.  On May 5, 2017, Ms. Nason received a merit increase in pay.

      d.  On January 1, 2018, PGH promoted Ms. Nason to District Manager ("DM") where she oversaw the daily operations of approximately fifteen different facilities throughout Maine, New Hampshire and Massachusetts, which also involved a significant pay increase.

19.     On or about November 12, 2018, Ms. Nason travelled to Saratoga Springs, NY to attend a conference for PGH management-level employees.

20.     On Tuesday, November 13, 2018, a number of PGH employees went out around 6:00 p.m. to a bar called Harvey's Restaurant after their conference had finished for the day, including Chris Hartsfield, PGH's then Chief Operating Officer ("COO") and Ms. Nason.

21.     In the span of three hours Prime's COO had 3 beers and 2 mixed drinks.

22.     At the bar, Ms. Nason approached Mr. Hartsfield in order to pitch him an idea about improving the business. He was Ms. Nason's boss's boss. She had never interacted with him in person prior to this occasion, although they had spoken on the phone and exchanged emails previously in the ordinary course of business.

23.     Mr. Hartsfield suggested that he and Ms. Nason sit on a couch in a separate part of the bar to talk about her idea more, away from other employees. Ms. Nason agreed.

24.     Ms. Nason is hard of hearing, so she sat next to the COO on the coach, instead of across from him because otherwise she wouldn't have been able to hear him. Due to her disability, Ms. Nason often has to lean in and be close to people to hear them—especially in a bar atmosphere.

25.     On the couch, Mr. Hartsfield started acting in a flirtatious manner towards Ms. Nason and made several comments that made her uncomfortable, including comments about her "beautiful eyes" and staying with her when he came to visit Maine.

26.     Despite being increasingly uncomfortable, Ms. Nason pitched Mr. Hartsfield her idea about an acquisitions team that she thought may be of benefit to PGH. Mr. Hartsfield made comments about promoting Ms. Nason to the open Regional Vice President position or the open Director of Training position. He told Ms. Nason to send him her resume that night.

27.     Mr. Hartsfield continued to act in a flirtatious manner that made Ms. Nason uncomfortable and asked her personal questions. Nevertheless, Ms. Nason thought that talking to the COO would be good for her career, so she stayed talking with him on the couch.

4

28.     During their conversation, Ms. Nason mentioned that she FaceTimes with her young son to read to him before bed if she is not home. Mr. Hartsfield asked about whether her Android phone did FaceTime. Ms. Nason said she also had a personal iPhone, which is what she uses to FaceTime. Mr. Hartsfield indicated he and she could talk via FaceTime and made a reference to them doing "personal things" on FaceTime, which Ms. Nason interpreted as a reference to something sexual.

29.     At 9:01 p.m. Ms. Nason couldn't take it anymore and sent a text to a colleague who was also at the bar. Her text said "help me."

30.     The colleague was outside smoking and invited Ms. Nason out to join her. Taking a "strength in numbers approach," the colleague and Ms. Nason went back inside and rejoined the COO on the couch. Ms. Nason sat next to him, and the colleague sat across from them on another couch.

31.     Ms. Nason began talking about work again. The COO then began rubbing Ms. Nason's back/butt, which made Ms. Nason visibly freeze up. She wasn't sure what to do. The colleague witnessed Mr. Hartsfield's behavior and Ms. Nason's response.

32.     Thankfully and perhaps not coincidentally, just after Mr. Hartsfield's inappropriate touching started, three of Ms. Nason's PGH colleagues came over and said it was time to go.

33.     One of the men who came over to say it was time to go was Ms. Nason's boss, Tony Ventura. He was looking right at Mr. Hartsfield when he was touching Ms. Nason, and it seemed to Ms. Nason like Mr. Ventura saw what Mr. Hartsfield was doing to her.

34.     The PGH employees left Harvey's together around 9:15 p.m., and the group from out-of-town, including Ms. Nason, crossed the street to walk back to their hotel.

35.     Mr. Hartsfield did not cross the street with everyone because he was from the area and was going home separately. He called Ms. Nason back across the street to him in front of

everyone and asked for her personal cell phone number for her iPhone. He already had her work cell phone number for her Android phone. Mr. Hartsfield also made a comment to Ms. Nason about wanting to use FaceTime in a sexual manner with her.

36.     Ms. Nason was mortified but acutely aware of the power differential between herself and the COO, so she gave him her personal iPhone number. He then initiated a hug with her.

37.     Ms. Nason was so upset about this that she spun around quickly to run back across the street and got her foot caught on the curb, which almost caused her to fall.

38.     Around 2:00 am, Ms. Nason received a call on her phone, but she didn't answer it.

39.     The following morning, November 14, 2018, Ms. Nason texted with the colleague who had witnessed the COO touch Ms. Nason inappropriately, who advised her to tell her boss, Mr. Ventura, that Mr. Hartsfield had made her very uncomfortable.

40.     The PGH employee manual "encourages reporting of all perceived incidents of discrimination or harassment" and lists "unwanted sexual advances," "request for sexual favors," "sexual jokes and innuendo" and touching as examples of what sexual harassment may include.

41.     Ms. Nason called her boss, Mr. Ventura, and reported that she felt uncomfortable attending the conference that day because Mr. Hartsfield would be in attendance. She then reported what had happened the night before.

42.     Ms. Nason made her report to Mr. Ventura because that was what PGH's sexual harassment policy and their on-line training said to do. The training said to report without fear of retaliation, and Ms. Nason believed that what had happened to her and what made her feel uncomfortable was illegal and against PGH company policy.

6

43.     After the call with Mr. Ventura, Ms. Nason received a text message asking her to meet in a hotel room with Angela Evans, HR, and Brianna Pierce, a PGH lawyer, who would be investigating her report.

44.     Unfortunately, PGH's so-called investigation into Ms. Nason's report quickly turned into an overzealous effort to clear PGH's male COO of wrongdoing.

45.     Ms. Nason was grilled twice before PGH's COO was interviewed at all, and then again for a third time after the COO was interviewed. Ms. Nason told the PGH's investigators that she was hard of hearing and anxious—symptoms of which PGH used as evidence to discredit Ms. Nason. Each time she was interviewed, the questions posed to Ms. Nason were more aggressive, suspicious and biased towards the conclusion that Ms. Nason was lying. PGH's investigators also wrote down what Ms. Nason said wrong and then accused her of changing her story when their notes or what Ms. Nason said were slightly different in each interview.

46.     For example, PGH's investigators accused Ms. Nason of changing her story in her third interview, that Mr. Hartsfield "did not touch her ass." They viewed this as a recantation of Ms. Nason's earlier statement where she said he touched her 'ass'. This so-called recantation was simply the product of their biased and shoddy investigation.  Ms. Nason told the investigators consistently every time they asked that the COO touched her in an inappropriate way on her back and butt that made her feel uncomfortable. What he did was rub Ms. Nason's back with his open palm from her shoulders down to the top of her butt where her butt crack starts. He couldn't run his hand any lower because she was sitting down. It's not as though he could reach under where she was sitting and cup her butt. PGH's investigators confused Ms. Nason by pressuring her to admit that what she was calling her 'ass' was actually not her 'ass.' She thought they were asking her if he reached down and cupped her 'ass', which he didn't do because he couldn't. It is

7

absolutely false that Ms. Nason ever "admitted" that "there was no physical touching of her back side or inappropriately at all."

47.     In their third interrogation of Ms. Nason, PGH's investigators led Ms. Nason to believe that what happened to her was not sexual harassment and then criticized her for walking back what they interpreted to be her report of sexual harassment, even though Ms. Nason never used those words.

48.     Through its investigation, PGH all but bullied Ms. Nason into apologizing for making a complaint about the COO and made her feel as though what she experienced was appropriate behavior by the COO.

49.     Ms. Nason's colleague was interviewed by the investigators twice and confirmed twice that she "definitely" saw Mr. Hartsfield rubbing Ms. Nason's back and possibly buttocks and that Ms. Nason and she exchanged uncomfortable looks and discussed the touching later.

50.     In comparison, PGH's investigators interviewed the COO just once and did not ask him nearly as many questions about the relevant facts, failed to follow up on obvious inconsistencies in his answers, ignored his level of inebriation and credited his denials of physical contact over the consistent testimony of two women.  PGH's investigators asked Mr. Hartsfield for his phone records but failed to ask him for his FaceTime call log, which would have shown (if he did not delete it) if he tried to FaceTime Ms. Nason on her personal iPhone.  Mr. Hartsfield also said that Ms. Nason never left the couch during the entire time they talked, which was obviously untrue and refuted by the testimony of three witnesses, but PGH's investigators never pressed him about his lie or followed up with him at all.

51.     On November 21, 2018, Ms. Evans and Ms. Pierce called Ms. Nason and fired her because of her report about the COO's conduct.  Over the phone, they stated that they concluded

8

their investigation and found her accusations to be false and indicated that Ms. Nason had admitted they were false the previous day during their third interview, which was not true.

52.     On or about November 27, 2018, PGH sent Ms. Nason a termination letter falsely stating that she had admitted that she lied during the investigation.

53.     ' Ms. Nason asked PGH what she had lied about and requested a copy of the investigation report, but was refused a response.

54.     Mr. Hartsfield was subsequently fired by PGH on or around May, 2019.

## COUNT I
### Gender Discrimination under the MHRA, 5 M.R.S. § 4572

55.     Plaintiff realleges and incorporates by reference the allegations set forth in the paragraphs above.

56.     The Defendant's treatment of Plaintiff was based on gender.  Plaintiff was targeted and sexually harassed because of her gender.  In response to pitching a business idea to the COO, the Plaintiff encountered flirtatious behavior, uncomfortable comments and inappropriate sexual touching by the COO.

57.     That gender-based harassment created an intimidating, hostile, and offensive working environment.  A reasonable person in Plaintiff's position would have found the harassment to be hostile and abusive, and Plaintiff experienced it as such.

58.     The sexual harassment by the COO during a company event was open and obvious.  Defendant failed to exercise reasonable care to prevent and promptly correct that conduct.  After Plaintiff reported the sexual harassment to the Defendant, they failed to take the gender discrimination in the form of sexual harassment seriously enough to take any action that would stop it, and instead fired her for coming forward against the COO.

59.     Plaintiff reported the sexual harassment to persons employed in managerial

capacities and who were acting within the scope of their employment.  The Defendant failed to

take prompt and appropriate remedial action against the harassing conduct.

60.     As a result of the treatment described in the above Complaint, Plaintiff suffered

damages.

61.     The Defendant acted with malice and with reckless indifference to Plaintiff's

protected civil rights.  The Defendant was motivated by discriminatory intent.

62.     The Defendant discriminated against Plaintiff in violation of the Maine Human

Rights Act, 5 M.R.S.A. § 4572.

## COUNT II
### Gender Discrimination under Title VII, 42 U.S.C. § 2000e-2

63.     Plaintiff realleges and incorporates by reference the allegations set forth in the

paragraphs above.

64.     The Defendant's treatment of Plaintiff was based on gender.  Plaintiff was targeted

and sexually harassed because of her gender.  In response to pitching a business idea to the COO,

the Plaintiff encountered flirtatious behavior, uncomfortable comments and inappropriate sexual

touching by the COO.

65.     That gender-based harassment created an intimidating, hostile, and offensive

working environment. A reasonable person in Plaintiff's position would have found the

harassment to be hostile and abusive, and Plaintiff experienced it as such.

66.     The sexual harassment by the COO was open and obvious.  The Defendant failed

to exercise reasonable care to prevent and promptly correct that conduct.  After Plaintiff reported

the sexual harassment and hostile work environment to the Defendant, they failed to take the

gender discrimination in the form of sexual harassment seriously enough to take any action that would stop it.

67.     Plaintiff reported the sexual harassment to persons employed in managerial capacities and who were acting within the scope of their employment.  The Defendant failed to take prompt and appropriate remedial action against the harassing conduct.

68.     As a result of the treatment described in the above Complaint, Plaintiff suffered damages.

69.     The Defendant acted with malice and with reckless indifference to Plaintiff's protected civil rights.  The Defendant was motivated by discriminatory intent.

70.     The Defendant discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

## COUNT III:
### Disability Discrimination under the MHRA, 5 M.R.S. § 4572

71.     Plaintiff repeats and realleges the paragraphs set forth above as if set forth in full herein.

72.     Plaintiff is, and was at all times pertinent to this action, covered by the provisions of the MHRA, 5 M.R.S. § 4553-A(1)(C) and (D) because she was regarded as having a disability and had a record of a disability.

73.     Plaintiff was and is qualified for the DM position with the Defendant since she satisfies the skill, experience, and other job-related requirements for the position, and since she was and is able to perform the essential functions of the position with or without reasonable accommodation.

74.     The Defendant intentionally discriminated against Plaintiff by failing to consider or accommodate her disabilities during its investigation and, instead, took adverse

11

action in the form of firing her, due to its negative conclusions about her report based upon the symptoms of her disabilities.

75.     The Defendant acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Plaintiff can be implied.

76.     As a direct and proximate result of the intentional discriminatory acts and practices of the Defendants, its agents and employees, Plaintiff has suffered and continues to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to her reputation, and other past and future pecuniary losses.

**COUNT IV:**
**Disability Discrimination under the ADA, 42 U.S.C. § 12112**

77.     Plaintiff repeats and realleges the paragraphs set forth above as if set forth in full herein.

78.     Plaintiff was and is a qualified person with a disability as defined by the ADA, 42 U.S.C. § 12102(1)(B) and (C) because she was regarded as having a disability and had a record of a disability.

79.     Plaintiff was and is qualified for the DM Position with the Defendant since she satisfies the skill, experience, and other job-related requirements for the position, and since she was and is able to perform the essential functions of the position with or without reasonable accommodation.

80.     The Defendant intentionally discriminated against Plaintiff by failing to consider or accommodate her disabilities during its investigation and, instead, took adverse

action in the form of firing her, due to its negative conclusions about her report based upon the symptoms of her disabilities.

81.     The Defendant engaged in discriminatory action in the face of a perceived risk that their actions would violate federal law.  Their acts and omissions were done maliciously or with reckless indifference to Plaintiff's federally protected rights.  Defendant made no good faith effort to prevent discrimination in Plaintiff's workplace.

82.     As a direct and proximate result of the intentional discriminatory acts and practices of the Defendant, its agents and employees, Plaintiff has suffered and continues to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to her reputation, and other past and future pecuniary losses.

**COUNT V**
**Discrimination under the WPA, 26 M.R.S. § 833(1)(A)**

83.     Plaintiff realleges and hereby incorporates the paragraphs set forth above as if set forth in their entirety.

84.     The Defendant intentionally discriminated against Plaintiff with respect to tenure, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions taken by Plaintiff that are protected under the WPA, in violation of the MHRA, 5 M.R.S. § 4572(1)(A).

85.     Plaintiff reported to Defendant that she had reasonable cause to believe there were violations of state or federal law.  26 M.R.S. § 833(1)(A).

86.     As a direct result of her report, Plaintiff was terminated.

87.     As a proximate result of Defendant's unlawful conduct alleged herein, Plaintiff has suffered emotional distress, loss of enjoyment of life, inconvenience, and other pecuniary and non-pecuniary losses.

88.     Plaintiff has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and Defendant is likely to perpetrate similar acts on others unless it is enjoined by this Court.

89.     The Defendant's unlawful conduct alleged herein was intentional.

90.     The Defendant's unlawful conduct alleged herein was undertaken with malice or with reckless indifference to Plaintiff's rights.

## COUNT VI
### Retaliation under the MHRA, 5 M.R.S. § 4633

91.     Plaintiff realleges and incorporates by reference the allegations set forth in the paragraphs above.

92.     The Defendant discriminated against Plaintiff because she reported sexual harassment and because she participated in an investigation of the same.

93.     The Defendant's actions in using the investigation about sexual harassment as the reason to terminate Plaintiff is a violation of 5 M.R.S. § 4633.

94.     Plaintiff was harmed by Defendant's actions.

95.     Defendant ought to have been aware of the illegality of terminating someone for reporting sexual harassment, yet Defendant engaged in – with reckless indifference and malice – retaliatory conduct against Plaintiff.

## COUNT VII
### Retaliation under Title VII, 42 U.S.C. § 2000e-3(a)

96.     Plaintiff realleges and incorporates by reference the allegations set forth in the paragraphs above.

14

97.     The Defendant discriminated against Plaintiff because she reported sexual harassment and because she participated in an investigation of the same.

98.     The Defendant's action in using the investigation about sexual harassment as the reason to terminate the Plaintiff is a violation of 14 U.S.C. § 2000e-3(a).

99.     Plaintiff was harmed by Defendant's actions.

100.    Defendant ought to have been aware of the illegality of terminating someone for reporting sexual harassment, yet Defendant engaged in – with reckless indifference and malice – retaliatory conduct against Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter an Order providing as follows:

A.      Enter judgment declaring that the Defendant's practices complained of herein are unlawful as alleged;

B.      Grant injunctive relief compelling Defendant to desist from all unlawful retaliation;

C.      Order the Defendant to pay lost wages and compensatory damages for non-pecuniary losses, including, but not limited to, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life;

D.      Order the Defendant to pay punitive damages;

E.      Order the Defendant to pay all litigation costs and expert witness fees;

F.      Order the Defendant to pay nominal damages;

G.      Order the Defendant to pay pre-judgment, post-judgment interest, and reasonable attorneys' fees;

H.      Grant such additional relief as this Court deems appropriate.

15

Amy Dieterich, Esq. Bar. No 5413
*Attorney for Melissa J. Nason*
SKELTON TAINTOR & ABBOTT
95 Main Street
Auburn, ME 04210
(207) 784-3200
adieterich@sta-law.com

Dated: January 6, 2021

16